* * * * * * * * * * *
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford, the briefs of the parties, and the arguments presented by Defendants. The notes submitted by Plaintiff's counsel, who was not able to present arguments at the hearing before the Full Commission due to a sudden illness, have been reviewed, but have not been received into evidence. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford, with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties through the Pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS GENERAL STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of parties.
4. An employee-employer relationship existed between the Plaintiff-employee and Defendant Tyson Foods, Inc. on or about February 24, 2008, and on or about August 14, 2008.
5. At all times relevant to this claim, Tyson Foods, Inc. was self-insured for the purposes of workers' compensation insurance.
 STIPULATIONS FOR I.C. FILE NUMBER 088545
6. The parties stipulate that Plaintiff alleges that he sustained a compensable injury by accident within the course and scope of his employment with Tyson Foods, Inc. on or about February 24, 2008.
7. On or about February 24, 2008, Plaintiff's average weekly wage was $640.65, yielding a hypothetical compensation rate of $427.12.
8. Defendants denied this claim via a Form 61 filed on October 21, 2008.
 STIPULATIONS FOR I.C. FILE NUMBER 080655
9. The parties stipulated that the date of Plaintiff's injury is August 14, 2008.
10. Plaintiff's average weekly wage was $640.65 with a compensation rate of $427.12.
11. Defendants accepted this claim via a Form 60 filed on September 4, 2008.
 STIPULATED EVIDENCE
12. The Pre-Trial Agreement of the parties was received as Stipulated Exhibit 1.
13. The Industrial Commission Forms filed in I.C. file number 088545 were marked as Stipulated Exhibit Two.
14. The Industrial Commission Forms filed in I.C. file number 080655 were marked as Stipulated Exhibit Three.
15. Plaintiff's medical records were collectively marked as Stipulated Exhibit Four.
16. The parties also stipulated to the admissibility of Defendant's Exhibit One, which consisted of discovery responses, Plaintiff's personnel file and an ergonomic job analysis.
 * * * * * * * * * * *
As set forth in the Pre-Trial Agreement and this Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether Plaintiff sustained a compensable injury by accident within the course and scope of his employment with Tyson Foods, Inc. on or about February 24, 2008, which resulted in the development of a hernia?
2. If so, what benefits, if any, is Plaintiff entitled to receive as a result of the injury by accident of February 24, 2008?
3. Whether Plaintiff is entitled to any additional benefits due to his compensable injury by accident of August 14, 2008?
 * * * * * * * * * * *
Based upon the competent evidence of record, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 54 years old, with a date of birth of November 22, 1956. He first began working for Tyson Foods in 1977 driving long distance. He worked up until 1994 or 1995, when he resigned from the company, due to personal family matters. Plaintiff returned to work for Tyson in 1997 and worked until April 2005.
2. Plaintiff returned to work for Tyson a third time in October 2005, and he has remained employed with Tyson since that time. He was employed as a Feed Truck Driver, Class 1. In the last three years, Plaintiff worked for Tyson picking up and hauling feed, using an 18-wheel tractor-trailer. When Plaintiff last drove the truck, Tyson had changed the feed truck from double wheels to single wheels, but the truck length was the same.
3. Plaintiff has been a heavy smoker for many years, smoking up to three (3) packs of cigarettes a day. Plaintiff was diagnosed with Chronic Obstructive Pulmonary Disease (COPD) by Dr. Alford in 2005. Dr. Alford did not place him under any specific restrictions due to his COPD at that time. Plaintiff was given an albuterol inhaler to use as needed.
4. Dr. Ashton Molai has been Plaintiff's treating physician since October 23, 2006, and testified in this case. Dr. Molai has practiced in Wilkes County for about 11 years, and he is twice board certified in family practice. Plaintiff became his patient following a referral from Dr. John L. Bond in October 2006, for establishment of care, as Plaintiff had several different ailments such as hypertension, high cholesterol, anxieties, depression, some COPD, and arthritis.
5. Dr. Molai testified that COPD is a disease entity where the bronchioles and/or the alveoli (end air sacks in the lungs) dilate and lose their elasticity and their ability to recoil. As a result, there is chronic trapping of air in the lungs with decreased oxygenation and concurrent dyspnea (shortness of breath) on exertion and overall fatigue.
6. When Dr. Molai first saw Plaintiff, he testified that Plaintiff's COPD was in a moderate to severe state. Dr. Molai explained that he educated Plaintiff and instructed him to stay away from pollens and dust, and most importantly, he advised Plaintiff to stop smoking. At that time, Plaintiff was smoking more than three packs of cigarettes per day. Although Dr. Molai counseled Plaintiff in smoking cessation, it took about three years before Plaintiff actually stopped smoking. In between those counseling sessions, Dr. Molai would treat Plaintiff for acute exacerbation, in addition to placing Plaintiff on appropriate maintenance medications, such as Albuterol, Atrovent, and Advair.
7. When Dr. Molai saw Plaintiff during a visit in January of 2007, Plaintiff complained of abdominal pain. After running tests, Dr. Molai found an abscess in Plaintiff's colon, a condition called diverticulitis. He treated Plaintiff with antibiotics and pain control. He did not refer Plaintiff to a surgeon as Plaintiff had already been to the hospital and had been evaluated by a surgeon, Dr. Alan Keys. On follow-up examination, it was found that Plaintiff's diverticulitis had improved.
8. Plaintiff contends that his COPD was aggravated or exacerbated by his employment, such that it should be compensable. However, the testimony of the physicians shows that Plaintiff's COPD was more closely related to his heavy smoking and fails to establish that Plaintiff's employment aggravated his COPD.
9. Dr. Keys, who is board certified in general surgery and has practiced in Wilkes County for 19 years, testified in this case. Dr. Keys first examined Plaintiff on December 11, 2006 for diverticulitis. He reported that Plaintiff had developed an abscess in the abdomen related to the diverticulitis. Dr. Keys explained that diverticulitis was caused by the development of infection in the diverticula or the outpocketings on the large intestine. This condition is not related to Plaintiff's employment. Dr. Keys placed Plaintiff on antibiotics and drained the abscess percutaneously with CAT scan guidance. Plaintiff improved over the course of about three weeks.
10. Once the abscess and infection were under control, Plaintiff underwent surgery by Dr. Keys on February 5, 2007. Dr. Keys removed the part of the large intestine that had the diverticulitis or infection. Subsequently, Plaintiff began having problems with severe hemorrhoids. Dr. Keys performed a hemorrhoidectomy on February 26, 2007.
11. In July 2007, Dr, Keys saw Plaintiff for a completely different issue from that surrounding his diverticulitis. Plaintiff was complaining of pain in the upper abdomen. Following an upper GI endoscopy, Dr. Keys found that Plaintiff did not have an ulcer, but he did have significant inflammation of the stomach along with severe gastritis. Plaintiff was prescribed medication and his body responded well to the medication.
12. Dr. Keys did not see Plaintiff again until September of 2007, when Plaintiff had a GI bleed from the intestinal tract. At that time, Dr. Keys noted that Plaintiff no longer had inflammation of the stomach, but a colonoscopy revealed some residual diverticula. Consequently, Plaintiff underwent a colon resection. Dr. Keys confirmed that none of these medical conditions for which he treated Plaintiff were work related.
13. Dr. Keys saw Plaintiff again in October of 2007, when Plaintiff had developed a hernia through the incision at the site of Plaintiff's colon resection. Dr. Keys explained that the hernia was caused by a weakening of the incision. Dr. Keys noted that lifting and straining can place a person at an increased risk of developing a hernia. He stated that while most people do not usually develop a hernia through an incision, some people do. Dr. Keys indicated, however, that he did not have any independent knowledge that Plaintiff's hernia was the result of any event that happened at work, and that it could have been caused by straining during a bowel movement or while lifting objects at home. Plaintiff did not make any workers' compensation claim with regard to this hernia.
14. Dr. Keys performed the hernia repair on October 22, 2007. Plaintiff had some breathing problems following the surgery. Per Dr. Keys, the symptoms may have been the result of a flare-up of the COPD, but he was unable to explain why Plaintiff had more difficulties with his breathing following the hernia repair than he did with the other surgeries. He noted, however, that smokers tend to have more problems breathing after being put under general anesthesia than non-smokers.
15. Dr. Molai saw Plaintiff in August and November 2007. Plaintiff reported symptoms of anxiety and depression. He had reduced his smoking from three packs of cigarettes per day to a quarter to half a pack. Dr. Molai noted that Plaintiff's lung capacity was still moderate to severe in severity relative to Plaintiff's COPD. He also mentioned that Plaintiff had a hernia repair since he last saw Plaintiff. Dr. Molai explained that a hernia is not something that just happens; it develops over time from a lack of exercise, overeating, too much abdominal girth, or excessive lifting. He stated that any behavior that causes the intestine to build up pressure and punch through the abdominal wall can result in a hernia.
16. Dr. Molai testified that, when he examined Plaintiff after the hernia repair, Plaintiff's oxygen saturation was 98% on room air, which meant Plaintiff was breathing normally. He explained that anything above 88%-90% was good. He noted that Plaintiff was still smoking, but was wearing a nicotine patch. He reported that Plaintiff's lung function had remained the same.
17. When Plaintiff returned to Dr. Molai in December of 2007, he was again smoking up to two packs of cigarettes per day. Plaintiff complained of restless legs and anxiety with insomnia. Dr. Molai found that Plaintiff had smoker's bronchitis. Dr. Molai treated Plaintiff with antibiotics and standard medical therapy that was superimposed on the COPD.
18. Following his hernia surgery, Plaintiff returned to Dr. Keys for several post-operative evaluations. In November of 2007, Plaintiff reported the development of a bulge around the incision site. Dr. Keys noted that this bulge was consistent with a seroma, a mass of fluid. Dr. Keys removed the seroma and stressed the importance of no lifting or straining. By December of 2007, the seroma had returned, and Dr. Keys drained it once again.
19. On January 7, 2008, Dr. Keys reported that he felt no hernia on examination of Plaintiff. Dr. Keys noted that there was a seroma, which he again drained. Dr. Keys permitted Plaintiff to return to work.
20. Plaintiff subsequently reported that he suffered a hernia while "picking up feed" on February 24, 2008. He testified that on the morning of February 24, 2008, he drove to a farm in Alexander County to pick up feed. He explained that some of the feed became stuck to the side of the tank, and he had to use a five-pound rubber hammer to dislodge the feed from around the sides of the tank. He stated that he was beating the tank over his head with the hammer when he felt a strong, burning, stinging sensation in his stomach. He stated that when he lifted his shirt, he saw a bulge just above his navel. Later that morning when he returned to the feed mill, he reported the alleged injury to his supervisor, Randy Johnson, who directed him to the Tyson Medical Department in Wilkesboro.
21. The deposition of Dr. Bond. was taken on April 29, 2010. Dr. Bond has been in practice for 50 years at Wilkes Surgical, and is board certified in the area of general and trauma surgery. Dr. Bond has performed a significant number of hernia repairs over the years. He explained that a hernia is caused from facia weakness, a support weakness of the body other than muscle.
22. Dr. Bond evaluated Plaintiff on February 25, 2008. Plaintiff reported that he felt a sharp pain in his upper abdomen after beating a bin with a hammer. Dr. Bond was aware of Plaintiff's prior large hernia repair in the upper abdomen. Dr. Bond had seen Plaintiff on October 30, 2007, and had advised Plaintiff that he might have a hard time "getting back" from the hernia repair. Upon examination, Dr. Bond found that Plaintiff had an area of weakness in the upper right aspect of the incision measuring about two centimeters. Dr. Bond testified that Plaintiff had an epigastric hernia between the zaphoid process of the chest and the umbilicus. He noted that Plaintiff was going to see Dr. Keys the next day.
23. Plaintiff returned to see Dr. Bond on February 27, 2008, bringing a note from Dr. Keys, confirming that Plaintiff had a hernia and that Plaintiff should not lift over fifteen (15) pounds. Plaintiff wanted to know if he could drive a truck, and Dr. Bond advised that would not be within the restrictions given by Dr. Keys.
24. Dr. Bond saw Plaintiff on March 27, 2008, when Plaintiff brought records from Dr. Key's office. Dr. Bond noted that Dr. Keys did not find a hernia in the examination of January 7, 2008, although he did note the seroma, which was drawn off with a needle. After reviewing these notes, Dr. Bond concluded and he has testified that in his opinion, Plaintiff had not properly healed from his hernia surgery when he returned to work. Per Dr. Bond, seromas are formed as the tissue is trying to heal and tissue beneath is not healing and puts off fluid.
25. As to causation of the hernia, Plaintiff reported to Dr. Bond that he was beating on a bin with a five-pound hammer at the time he felt pain. Dr. Bond noted that this activity could cause a hernia because of the abdominal pressure from straining. However, it was his opinion that the seromas coupled with the development of weakness and a recurrent enlarging hernia were a continuation of the old hernia repair that was not adequately healed. In Dr. Bond's opinion, the repeat hernia was a continuation of the first hernia, and was not job-related.
26. Upon examination of Plaintiff on February 26, 2008, Dr. Keys found that Plaintiff had pain in the area of incision from his prior hernia repair and Dr. Keys assessed a recurrent hernia. Dr. Keys wanted to wait about two months so that Plaintiff would be at least six months past the initial hernia repair, before conducting further surgery. Per Dr. Key's testimony, this would give Plaintiff some additional time for healing to let the tissues around the incision site strengthen.
27. Dr. Keys testified that Plaintiff related his recurrent hernia to tasks at work, specifically lifting. Dr. Keys did not specifically state his opinion as to causation of the hernia, but merely stated what Plaintiff had reported to him by way of history.
28. Plaintiff returned to work on March 3, 2008, and worked for a couple of weeks, but began having problems. Plaintiff returned to see Dr. Keys and was given a binder to place around his stomach to help support him while working.
29. Plaintiff followed up with Dr. Bond on April 15, 2008. Dr. Bond opined that Plaintiff did not have a significant job aggravation, as he did not feel that Plaintiff's condition was work related. He explained that Plaintiff returned to work without consulting his doctor, and he was still having difficulties with the seromas at the time of his return to work.
30. On May 12, 2008, Dr. Keys performed the second hernia repair surgery. During the surgery, Dr. Keys found a significant amount of scarring along with seromas in the anterior aspect of the mesh support and behind the mesh that was inserted during the initial hernia repair. He noted that the mesh had not incorporated into the tissue at all.
31. Dr. Bond evaluated Plaintiff one last time on June 26, 2008. Dr. Bond reviewed the medical records from Dr. Keys, including the surgical note. After assessing the surgical procedure, he noted that whenever seromas occur and a mesh-type gauze is utilized in the repair, it is difficult for the tissue to heal around the mesh gauze. He reiterated his opinion that Plaintiff's recurrent hernia and second surgery were a continuation of his original hernia, as the seroma continued to grow larger, and that the hernia was not a job-related condition.
32. Plaintiff was evaluated by Dr. Keys on July 1, 2008. Plaintiff complained of significant discomfort in the lower abdomen suprapubic area just to the right of the midline. Dr. Keys recommended a CT to rule out diverticulitis as opposed to the possibility of a recurrent hernia. Consequently, he wrote Plaintiff out of work until July 27, 2008 and instructed Plaintiff to follow up with him in three to four weeks. Plaintiff was out of work for ten weeks following surgery and returned to full duty work on July 27, 2008.
33. Tyson denied Plaintiff's hernia claim (I.C. File No. 088545) via a Form 61. No Form 33 was ever filed in connection with the hernia claim. Consequently, on December 9, 2008, Tyson filed a Form 28B.
34. In weighing the medical evidence with regard to the Plaintiff's recurrent hernia, the Full Commission finds that the evidence fails to support Plaintiff's position that the hernia diagnosed in February of 2008 was caused by an accident at work. Dr. Bond was not of that opinion, and Dr. Keys did not offer any opinion to a reasonable degree of medical certainty. Dr. Keys only stated what Plaintiff told him.
35. On August 14, 2008, Plaintiff sustained an injury to his right shoulder. Plaintiff was at a farm in Miller's Creek delivering feed, and was parked on a hill, which, in turn, placed the trailer on the feed truck about three feet off the ground. Plaintiff had to jump to open the feed bin on the trailer, which was above his head. During this process, as his feet were off the ground and he was reaching up, he was temporarily suspended from the door, hanging by his right arm. He let go and when he hit the ground, he felt pain in his shoulder. Plaintiff completed the delivery, using his left arm. Tyson accepted the right shoulder injury as compensable via a Form 60 (IC file no. 080655).
36. Plaintiff returned to Tyson and went to the medical department, where a nurse applied ice to his shoulder. Plaintiff was instructed to go home for the evening and to call the department if his shoulder was still hurting the next morning.
37. Plaintiff called the medical department the next morning to report that he had been in severe pain with his shoulder all night. The nurse referred Plaintiff to Dr. Bond, who placed Plaintiff on modified duty. Plaintiff was given modified duty work consisting of sweeping the floors and helping his supervisor, Mr. Johnson, wherever he was needed.
38. Per Tyson's request, Plaintiff began treating for his right shoulder with Dr. Stephen J. Sladicka of Carolina Orthopaedic Specialists. Dr. Sladicka has practiced orthopedics for 18 years, and he is board certified in general orthopedics. He first evaluated Plaintiff on November 26, 2008, at which time Plaintiff was on light duty work. Plaintiff complained of burning and tingling in the back of his neck and problems with overhead use of his arms.
39. Upon his examination of Plaintiff, Dr. Sladicka found tenderness to palpation at the superior medial border of the scapula. He also found symptoms of impingement or pain in the shoulder when raising the arm overhead. Plaintiff also exhibited mild weakness in external rotation and decreased strength. Dr. Sladicka referred Plaintiff for an MRI, as he suspected a rotator cuff tear. He also suspected some myofascial pain.
40. The MRI of Plaintiff's right shoulder was positive for an intrasubstance tear of the rotator cuff and AC joint arthritis. On January 7, 2009, Dr. Sladicka performed a right shoulder arthroscopy, debridement of labrum, arthroscopic subacromial decompression, and arthroscopic distal clavicle excision. Following surgery, Plaintiff had difficulties reaching above his head and moving his arm. Dr. Sladicka referred Plaintiff to physical therapy and work hardening.
41. On February 4, 2009, Plaintiff reported some improvement, but noted that he still had some shoulder pain that radiated into his neck. Dr. Sladicka noted that it was normal for some patients to experience pain longer than others following surgery. He permitted Plaintiff to return to modified duty work on February 9, 2009.
42. On February 11, 2009, Tyson attempted to return Plaintiff to work inside Tyson's Wilkesboro, North Carolina fresh plant. Plaintiff testified that he went back to work on the paw line in the fresh plant, but could not tolerate the smell due to his breathing.
43. On February 12, 2009, Dr. Molai completed a Tyson Return to Work Certification on which he indicated that Plaintiff was complaining that his breathing was affected by the smell and dust inside the building. Dr. Molai noted that he could only say that Plaintiff's respiratory system was very sensitive and may trigger exacerbation of the pre-existing COPD. Thereafter, Plaintiff began receiving temporary total disability compensation.
44. Plaintiff returned to Dr. Sladicka on March 4, 2009 and reported that Dr. Molai had written him out of work. Dr. Sladicka noted that Plaintiff's shoulder was doing well. He observed that Plaintiff exhibited mild soreness at end range of motion, but strength was good with internal and external rotation. Dr. Sladicka also noted that Plaintiff's family doctor had taken him out of work due to breathing problems.
45. At his April 29, 2009 visit to Dr. Sladicka, Plaintiff reported ongoing pain in the shoulder that was not localized to one spot. Dr. Sladicka found that Plaintiff had significant cogwheel movement throughout the shoulder. He explained that cogwheel movement meant that Plaintiff was resisting when he was trying to manually raise Plaintiff's arm, such that Plaintiff would forcibly push down in the opposite direction. He noted that Plaintiff's subjective complaints were not yielding significant objective findings. Consequently, he referred Plaintiff for a Functional Capacity Evaluation (FCE).
46. The FCE was performed on June 3, 2009, and the results indicated that Plaintiff was able to perform light level work. Pursuant to the FCE, Dr. Sladicka released Plaintiff to return to sedentary-type work on June 19, 2009 with no lifting more than twenty (20) pounds occasionally and ten (10) pounds frequently.
47. Dr. Molai has seen Plaintiff about every three months for regular check-ups. When he evaluated Plaintiff in May 2009, Plaintiff reported that he was down to smoking one and a half packs of cigarettes per day. Plaintiff also complained of shoulder and neck pain, for which Dr. Molai prescribed some arthritis-type medicine. Dr. Molai put Plaintiff on oxygen during the Spring of 2009. He explained that he prescribed two liters of oxygen at night and anytime Plaintiff felt shortness of breath. Plaintiff was getting more fatigued and tired, and an oximetry test indicated that Plaintiff needed oxygen at night.
48. Per Dr. Molai's testimony, smoking cessation is very important to a patient with COPD because, in his opinion, "smoking is probably the biggest culprit that will destroy a lung in anyone." Even as his symptoms worsened, Plaintiff continued to smoke.
49. On August 18, 2009, Dr. Molai wrote a note stating that Plaintiff needed oxygen 24 hours a day, seven days a week. He also stated that Plaintiff was to avoid ambient smoke and dust as much as possible, including tobacco. Per Dr. Molai, the progression of Plaintiff's COPD brought on the need for constant oxygen.
50. Dr. Molai explained that anything could aggravate COPD, such as a change in temperature, allergens in the atmosphere, dust load in the atmosphere, viruses, bacteria, fungus, humidity, stress, exposure to dust in the feed mill, or riding in a truck with an open window. He stated that, although those are all potential irritants to the respiratory system, he could not say for sure whether any of those things actually aggravated Plaintiff's COPD. He noted that there is no work up available to determine what actually caused COPD in a patient.
51. Per Dr. Molai's testimony, Plaintiff had undergone at least four surgeries while in his care. Plaintiff required additional oxygen before, during, and after those surgeries. Following these surgeries, Plaintiff would start to wheeze, have bronchial spasms, and get hypoxic, which means his oxygen level would drop. As a result, Plaintiff was given bronchodilators, pulmonary toileting, steroids, treatments for his lungs, and additional oxygen. Dr. Molai clarified, however, that putting Plaintiff to sleep during those surgeries did not exacerbate his COPD, but did expose the severity of Plaintiff's condition.
52. On July 8, 2009, Tyson had an Ergonomic Job Analysis prepared for the Feed Haul Trucker position held by Plaintiff at the time of his injury. Although Plaintiff was not present to participate in the analysis, another driver was studied while performing the same position. After conducting the analysis, the consultant concluded that Plaintiff could perform those tasks which involved upward reaching by substituting his non-injured arm. In addition, the consultant noted that the job did not require manual material handling/lifting and that any lifting restrictions imposed by a physician would be deemed within acceptable parameters. Ultimately, the consultant concluded that Plaintiff could feasibly return to his job as a feed haul truck driver.
53. With regard to his right shoulder, Plaintiff testified that he still cannot raise his arm above shoulder height without someone pushing it up the rest of the way. He noted that raising his arm to shoulder height caused pain. He explained that when his arm is pushed above shoulder height, there is a popping sound. He stated that he still has pain in his shoulder and that surgery did not provide him any relief.
54. At the request of Plaintiff, Tyson approved an independent medical examination for him with Dr. Gary G. Poehling, which was done on October 19, 2009. Plaintiff complained to Dr. Poehling that his neck and shoulder were giving him extreme pain. Upon examination, Dr. Poehling found that Plaintiff had a prominent scapula, which became more prominent as Plaintiff raised his arm. He found that Plaintiff exhibited extreme pain at the insertion of the levator scapulae muscle, which is the muscle on the wing bone that is closest to the spine. Dr. Poehling explained in his testimony that this is a common problem area when there is trouble with a shoulder and the scapula is trying to protect the shoulder. Dr. Poehling assessed Plaintiff with dystrophic pain, chronic in nature, also referred to as chronic regional pain syndrome (CRPS).
55. Dr. Poehling testified that the majority of Plaintiff's pain was dystrophic pain in the scapula associated with the shoulder and radiating into the neck. He noted that the actual area of local tenderness was the levator scapulae. He stated that dystrophic pain is pain that comes through the nervous system and is ongoing pain that never goes away. He noted that Plaintiff had all the characteristics of dystrophic pain such as the weakness and inability to function.
56. Due to Plaintiff's pain and limitations in function due to the pain, Dr. Poehling did not agree with Dr. Sladicka's recommendation that Plaintiff could return to work with Tyson Foods, Inc. Dr. Poehling also disagreed with the five percent (5%) rating assigned by Dr. Sladicka because such a rating suggested that Plaintiff did not lose any function, that he had an operation and everything was perfect again.
57. Based on his evaluation, Dr. Poehling concluded that Plaintiff could not return to work as a feed truck driver. He noted that Plaintiff had no ability to take his hand from his waist to the shoulder and that most truck drivers are not in situations where they can keep their arm completely by their side. He stated that it was reasonable for Plaintiff to feel pain while changing the gears in his truck, but noted that an even bigger problem would be trying to undo the feed bins due to the overhead activity. He reported that Plaintiff could not lift his arm over 60 degrees. Dr. Poehling indicated that he would assign a twenty-five percent (25%) rating to Plaintiff's right upper extremity.
58. Dr. Bond reviewed Dr. Poehling's IME report. He agreed with Dr. Poehling on some points, but not on others. When Dr. Bond examined Plaintiff the day after his injury, Plaintiff had full range of motion and no tenderness along the shoulder, which he would expect to find with a rotator cuff injury. He reported that Plaintiff exhibited pain mostly in the medial aspect of the scapula and that there was a lack of muscle development in the rhomboid and trapezius on Plaintiff's right side. Dr. Bond's testimony indicates that the lack of of muscle development in the right rhomboid and trapezius was not the result of the injury. Dr. Bond opined that Dr. Poehling observed the after-effects of Plaintiff's surgery and that, based on the amount of muscle loss and poor development, he was not surprised that Plaintiff's shoulder symptoms continued to show up later.
59. Dr. Sladicka also had a chance to review the report of Dr. Poehling's examination. Dr. Sladicka had not noticed any abnormalities in Plaintiff's levator scapulae, which Dr. Poehling reported as abnormal. Dr. Sladicka gave Plaintiff a five percent (5%) rating based on Plaintiff's range of motion and the rotator cuff surgery. Dr. Sladicka noted that the rating assigned by Dr. Poehling was significantly higher than the rating he had assigned because Dr. Poehling made the additional diagnosis of RSD.
60. Dr. Sladicka's decision to return Plaintiff to work was based on Plaintiff's performance during the FCE, not Plaintiff's report of his previous job duties at Tyson. However, in response to questions regarding job duties from Plaintiff's counsel, and considering the FCE results, Dr. Sladicka determined that Plaintiff would not be able to carry out his prior duties as a truck driver with Tyson. In particular, the job would really require Plaintiff to engage both arms at the same time, and overhead activity inconsistent with Plaintiff's FCE.
61. In weighing the evidence regarding Plaintiff's shoulder injury, it is found that the preponderance of the evidence shows that Plaintiff would have difficulty performing his prior job as a feed truck driver for Tyson. It would be difficult for him to do this job using only his left arm, where certain tasks require overhead lifting and use of both arms.
62. Based on the preponderance of the evidence in view of the entire record, including the testimony of Drs. Poehling and Sladicka and the results of the FCE, as the result of his admittedly compensable August 14, 2008 injury by accident, Plaintiff has been unable to earn any wages in his former employment with Defendant-Employer or in any other employment through the present and continuing.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. The greater weight of the evidence fails to establish that Plaintiff sustained an injury by accident arising out of and in the course of his employment with Tyson Foods on or about February 24, 2008, which resulted in a hernia. N.C. Gen. Stat. § 97-2(6); Click v. Pilot Freight Carriers,Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
2. The greater weight of the evidence fails to establish that Plaintiff's pre-existing Chronic Obstructive Pulmonary Disease (COPD) was materially aggravated by his employment with Defendant Tyson Foods. N.C. Gen. Stat. § 97-2(6); Click v. Pilot FreightCarriers Inc., 300 N.C. 164, 265 S.E.2d 389 (1980).
3. On or about August 14, 2008, Plaintiff sustained an admittedly compensable injury by accident to his right shoulder. N.C. Gen. Stat. § 97-2(6).
4. As a consequence of his right shoulder injury, per the testimony of competent and credible physicians, Plaintiff has developed chronic regional pain syndrome, such that in addition to impairment from his shoulder injury, Plaintiff also suffers from chronic pain, which also restricts his activities with his right shoulder. Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003).
5. Defendants admitted the compensability of Plaintiff's August 14, 2008 injury by accident by filing a Form 60 on September 4, 2008. However, the Form 60 does not create a presumption of continuing disability and therefore the burden of proving disability remains with Plaintiff. Sims v. Charmes/Arby'sRoast Beef, 142 N.C. App. 154, 542 S.E.2d 277, disc. reviewdenied, 353 N.C. 729, 550 S.E.2d 782 (2001).
6. In order to meet the burden of proving disability, Plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury.Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution,108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms., Inc., supra.
7. In the instant case, Plaintiff met his initial burden to show that he is disabled. The preponderance of the medical evidence shows that, as the result of his August 14, 2008 work-related injury by accident, Plaintiff has been physically incapable of work in any employment through the present and continuing. Russell v. LowesProduct Distribution, supra.
8. Defendants have not shown that suitable jobs are available for Plaintiff and that Plaintiff is capable of obtaining a suitable job, taking into account Plaintiff's physical, mental and vocational limitations. Demery v. Perdue Farms, Inc., supra.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for benefits for his recurrent hernia is Denied.
2. Plaintiff's claim for benefits for his chronic obstructive pulmonary disease is Denied.
3. Defendants shall pay all medical expenses related to Plaintiff's right shoulder injury of August 14, 2008.
4. Subject to the attorney's fee set forth below, Defendants shall continue to pay Plaintiff compensation at the rate of $427.12 per week for temporary total disability, until further Order of the Commission.
5. Twenty-five percent of Plaintiff's ongoing compensation is approved as a fee for his attorney and every fourth check shall be paid to his attorney.
6. Defendants shall pay the costs.
This the ___ day of August, 2011.
 S/_________________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/_____________ BERNADINE S. BALLANCE COMMISSIONER
 S/_____________ DANNY L. McDONALD COMMISSIONER *Page 1